**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-1291

THE ESTATE OF SUSAN V. CESPEDES,
by and through its personal representative Jonathan Cespedes;
JONATHAN CESPEDES, individually;

       Plaintiffs,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.;
EL PASO COUNTY, COLORADO;
BOARD OF COUNTY COMMISSIONERS, EL PASO COUNTY;
SHERIFF BILL ELDER, in his official capacity;
TABATHA COYLE, LPN, individually;
NICOLE EMANUEL, LPN, individually;
ANGELA RUPE-LIPPERT, RN, individually;
THEODORE JIMENEZ, LPN, individually;
RANDOLPH MAUL, MD, individually,

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

       Plaintiffs, by and through their attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complain against Defendants and request a trial by jury as follows:

## I.  INTRODUCTION

       1.    Susan Cespedes died as an inmate in El Paso County Jail on October 18, 2018 as a result of deliberate indifference and negligence to her known serious medical needs by Defendants.

       2.    Health care workers knowingly ignored and disregarded her worsening condition and symptoms which included inability to eat, persistent vomiting and diarrhea, intense pain, abnormal vital signs, and other emergent symptoms. Ms. Cespedes developed kidney failure and

complications from her diabetes from lack of eating and dehydration, eventually causing respiratory failure, but health care workers ignored her life-threatening symptoms while she grew increasingly sick and near death.

3.      Even on the final day of her incarceration, when Ms. Cespedes's vitals were so critical they were no longer obtainable by jail health care workers, and as she lost the ability to speak clearly, lost her vision, was unable to hold herself up, and was cold and pale, health care workers took hours to respond to her critical condition.

4.      By that time, when she was finally hospitalized, she was in acute respiratory distress, metabolic acidosis, and acute renal failure.  She was in critical condition and the hospital was not able to save her.  She died two days later.

## II.  JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

6.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

7.      Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

8.      The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act

("CGIA").

9.      Colo. Rev. Stat. § 13-21-201, known as the Wrongful Death Act, creates a single wrongful death claim that may be brought by a decedent's surviving spouse and children. Regardless of who brings the claim, all of the children of Ms. Cespedes have an interest in the judgment as described by relevant statutes, and the party who brings the claim, here Jonathan Cespedes, does so for the heirs of Susan Cespedes, including the other non-named parties.

### III.  PARTIES

10.     At all times pertinent hereto, the decedent, Susan Cespedes, was a resident of the State of Colorado and a citizen of the United States of America.

11.     At all times relevant hereto, Plaintiff Jonathan Cespedes was a resident of the State of Tennessee and a citizen of the United States of America.  Plaintiff Jonathan Cespedes is the son of Susan Cespedes and Personal Representative of her Estate, which was opened in El Paso County.

12.     The Defendant Board of County Commissioners, El Paso County, a/k/a "BOCC" is a governmental entity chartered under the laws of the State of Colorado.  Among other things, El Paso County, through the El Paso County Sheriff's Office ("Sheriff"), operates the El Paso County Criminal Justice Center ("CJC" or "the jail"), located at 2739 E. Las Vegas St., Colorado Springs, Colorado 80906.

13.     The Defendant BOCC represents, oversees, and sets policy for El Paso County Colorado. The BOCC also contracted with Defendant Armor Correctional Health Services, Inc. ("Armor") to provide health care to the inmates at the jail.

14.     Defendant Bill Elder, in his official capacity, is the El Paso County Sheriff and is a

final policy maker for El Paso County with respect to all matters concerning the Sheriff's Office and all of its divisions, including the El Paso County Criminal Justice Center ("CJC" or "the jail").

15.     The El Paso County Sheriff and the BOCC are collectively referred to herein as "El Paso County," "El Paso County Defendants," or "the County."

16.     Although the County has sought to privatize the provision of healthcare services to its population of pre-trial detainees and post-conviction inmates, it has a non-delegable duty to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, practices and for the deliberately indifferent medical care and treatment of persons detained in the CJC, including Ms. Cespedes, by its contractors, their agents and employees.

17.     The intent of the next paragraph is to identify all corporate entities with which El Paso County contracted and/or with which subcontracts were made, to provide medical care and/or mental health services to the inmates at the jail during the period in question.

18.     Defendant Armor Correctional Health Services, Inc. ("Armor") is a private Florida corporation doing business in the state of Colorado with its principal address located at 4960 SW 72nd Ave., Ste. 400, Miami, Florida, and its registered agent in Colorado, CT Corporation System, located at 7700 E. Arapahoe Rd., Ste. 220, Centennial, CO.

19.     Defendant Armor contracts with El Paso County to provide medical services to its inmates and supervises and implements such care. Upon entering into contracts or subcontracts to provide medical and/or other services to El Paso County inmates, Armor assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

20.     Defendant Armor is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the provision of medical care and treatment for inmates.

21.     Defendant Armor is also properly sued for its own negligence and the negligence of its agents and employees under state law.

22.     Defendant Armor is vicariously liable for the acts and omissions of its medical workers and agents.

23.     El Paso County Defendants and Defendant Armor are collectively referred to herein as the "Entity Defendants."

24.     At all times relevant hereto, Defendant LPN Tabatha Coyle was a citizen of the United States and a resident of Colorado. Defendant Coyle was an agent, employee, and/or subcontractor of Defendant Armor and was responsible for providing medical care to Susan Cespedes during her detention. At all material times, this Defendant was acting under color of state law.

25.     At all times relevant hereto, Defendant LPN Nicole Emanuel was a citizen of the United States and a resident of Colorado. Defendant Emanuel was an agent, employee, and/or subcontractor of Defendant Armor and was responsible for providing medical care to Susan Cespedes during her detention. At all material times, this Defendant was acting under color of state law.

26.     At all times relevant hereto, Defendant RN Angela Rupe-Lippert was a citizen of the United States and a resident of Colorado. Defendant Rupe-Lippert was an agent, employee, and/or subcontractor of Defendant Armor and was responsible for providing medical care to Susan

Cespedes during her detention. At all material times, this Defendant was acting under color of state law.

27.     At all times relevant hereto, Defendant LPN Theodore Jimenez was a citizen of the United States and a resident of Colorado. Defendant Jimenez was an agent, employee, and/or subcontractor of Defendant Armor and was responsible for providing medical care to Susan Cespedes during her detention. At all material times, this Defendant was acting under color of state law.

28.     At all times relevant hereto, Defendant Dr. Randolph Maul was a citizen of the United States and a resident of Colorado. Defendant Maul was an agent, employee, and/or subcontractor of Defendant Armor and was responsible for providing medical care to Susan Cespedes during her detention. At all material times, this Defendant was acting under color of state law.

29.     Defendants Coyle, Emanuel, Rupe-Lippert and Maul are referred to herein as "Individual Defendants."

### IV.   **STATEMENT OF FACTS**

30.     Ms. Cespedes was incarcerated at the El Paso Criminal Justice Center as a pre-trial detainee on September 13, 2018. From day one CJC staff understood that she had a number of significant medical conditions—diabetes, kidney disease, COPD, hypertension—which, if not monitored and treated adequately, could cause her serious injury or worse.

31.     Specifically, jail health care workers knew that Ms. Cespedes had diabetes, high blood pressure, COPD, arthritis, fibromyalgia, and a history of back surgeries.

32.     "Health care workers," as used herein, includes Emergency Medical Technicians

("EMT"), Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), Nurse Practitioners ("NP"), Physicians' Assistants ("PA"), and doctors.

33.     "Health care providers," as used herein, includes NPs, PAs, and doctors.

34.     It is a common and recurring need in all jails that inmates whose medical condition is deteriorating need to be transported timely to hospitals for higher level assessment and higher acuity medical care.

35.     Evaluating and addressing the needs of inmates with dehydration, respiratory distress, abnormal vital signs, vomiting, and severe pain, as well as associated medical conditions, is a usual and recurring task for health care and detention workers in the El Paso County jail.

36.     All reasonable health care workers are aware that inmates with abnormal vital signs, increased confusion, increased and severe pain, trouble breathing, inability to hold down food, persistent refusals to eat, or persistent vomiting need higher level evaluation and treatment than can be provided in the jail.

37.     All reasonable health care workers know that it is dangerous to continue to give medication to someone to lower their blood pressure when their blood pressure is already abnormally low.

38.     All reasonable health care workers are aware that dehydration can cause serious injury and death if untreated.

39.     All reasonable health care providers know that it is dangerous to give prolonged ibuprofen to a patient with hypertension, kidney disease or diabetes.

40.     All reasonable health care providers know that ibuprofen can cause kidney damage and renal failure, especially in a patient with kidney disease.

41.     Patients like Ms. Cespedes are well known to doctors like Dr. Maul to be at risk for lactic acidosis.

42.     All reasonable health care providers know that vomiting, abdominal pain, itching, fatigue, aches, weakness, and inability to hold down food are emergency symptoms in a diabetic with hypertension and kidney disease.

43.     It is outside the scope and practice of EMTs and nurses to diagnose or determine the cause of signs and symptoms. EMTs and nurses have a duty to convey any abnormal signs, symptoms or vitals to a provider who can diagnose the cause of the abnormals. All trained EMTs and nurses know that failure to communicate abnormal findings to a provider can cause serious injury or death.

44.     On September 13, 2018, Dr. Maul, an Armor doctor working for Armor at the jail, prescribed omeprazole (for heartburn and GERD), ibuprofen, metformin (for diabetes), verapamil (for high blood pressure), and propranolol (also for high blood pressure) for Ms. Cespedes.

45.     Ms. Cespedes was taken off her prescription opioid medications upon admission to the jail and given ibuprofen instead.

46.      She was placed on COWS checks, which is an opiate withdrawal protocol which involves periodic checks to evaluate for a number of serious signs of withdrawal, including vomiting or diarrhea. Vomiting and diarrhea are known complications of detoxing from opiates and must be monitored.

47.     Ms. Cespedes' COWS checks were sloppily administered.  She was checked twice on 9/14, once on 9/15, not at all on 9/16, and once on the 17th, 18th, 19th, and 20th. On only one occasion during this period did the COWS checks record any nausea or vomiting.

48. However, by September 16, 2018, Ms. Cespedes began complaining of diarrhea and vomiting, chills, severe abdominal and back pain, telling a visitor that she vomited everything she ate.

49. By late September Ms. Cespedes' food intake declined markedly. She was unable to eat much and whatever she ate, she vomited. She had chills.

50. On September 29, 2018, Angela Lippert, RN, put Ms. Cespedes on a Gastrointestinal Nursing Protocol for vomiting and abdominal pain, specifically in the mid left abdomen and bilateral flanks.

51. Ms. Cespedes reported decreased appetite, vomiting, and diarrhea.

52. RN Rupe-Lippert recorded that she had only a "single episode of vomiting" but in fact Ms. Cespedes had been vomiting and had diarrhea since September 16, 2018.

53. Also, on September 29, 2018, RN Rupe-Lippert increased Ms. Cespedes's ibuprofen prescription to three tabs three times a day, a very high dose likely to cause stomach and kidney problems in a healthy person, but extremely likely to cause significant problems for Ms. Cespedes who had a history of kidney disease and who was not eating. Dr. Maul signed off on this increase even though it would obviously worsen her kidney failure and overall condition.

54. In early October, Ms. Cespedes continued to vomit. Acting outside her scope of practice, RN Rupe-Lippert "diagnosed" and treated Ms. Cespedes without obtaining confirmation that she had a UTI or testing her urine for bacteria. No treatment, evaluation or acknowledgement of her profound inability to eat or hold down food or water was provided or even discussed.

55. RN Rupe-Lippert started Ms. Cespedes on antibiotics without calling a doctor. This was outside the scope of practice for a nurse. The order for ciprofloxin (antibiotics) was not

approved by a doctor for several days after the medicine was started by the nurse.

56.     Antibiotics like ciproflaxin are known to increase stomach upset, vomiting and dehydration when given.

57.     Predictably, Ms. Cespedes continued vomiting and not eating.

58.     Individual Defendants gave her nothing for dehydration and took no steps to monitor her hydration.

59.     During this time, she complained to family that she could not sleep or eat and that anything she ate she vomited. She continued to have diarrhea.

60.     Ms. Cespedes's body hurt so bad that she felt like she couldn't stand up.

61.     Even though ibuprofen and antibiotics are known to exacerbate stomach problems, and ibuprofen known to worsen kidney failure and cause pain, and even though there was no reason to think that she had a bacterial infection, staff continued to give her ibuprofen and antibiotics and, predictably, Ms. Cespedes continued to get worse.

62.     None of the involved individual defendants made any efforts to evaluate Ms. Cespedes regarding why she continued to vomit and why she was in so much pain that they had to continue to increase her ibuprofen, instead just increasing her ibuprofen which was known to increase kidney damage and stomach pain, but was blithely in increasing doses administered without any evaluation.

63.     Throughout the first weeks of October until her death, as her food intake utterly collapsed, Ms. Cespedes continued to complain to CJC staff about nausea, vomiting, and abdominal pain.

64.     On video calls and phone calls from this time period in the jail, Ms. Cespedes can

be seen and heard vomiting. She reports that she is vomiting yellow material and that her back and abdomen hurt.

65. She repeatedly told medical staff about her illness, but they wouldn't do anything for her. On one video visit while Ms. Cespedes is vomiting, a nurse can be seen giving Ms. Cespedes ibuprofen, a medication that only worsens abdominal pain and stomach upset and doing nothing about her vomiting.

66. On October 8, 2018, Ms. Cespedes was seen by Dr. Maul who she told about her continued stomach pain and nausea. In this patient with known diabetes, with prolonged known vomiting, with excessive prolonged ibuprofen use in the context in kidney disease, he recklessly did nothing to evaluate the cause of her vomiting. He gave her anti-nausea medication with no analysis or diagnostic testing of why she was vomiting, why she was sick or any diagnostic analysis at all.

67. It was well known and obvious to Dr. Maul that a patient like Ms. Cespedes with diabetes treated with metformin, kidney disease, vomiting, abdominal pain and dehydration was extremely likely to be developing a life threatening condition and required intervention, yet Dr. Maul did nothing to treat or evaluate the cause of Ms. Cespedes's serious and obvious symptoms.

68. On October 9th, she again told her family that she was sick and no one at the jail would help her. She was vomiting yellow material.

69. Jail staff recorded Ms. Cespedes' food intake and, with two or three small exceptions for snacks, from October 8th until she was hospitalized on the 16th, Ms. Cespedes refused all meals without intervention. They thus knew she was not eating and at risk for death.

70. On October 13th, Ms. Cespedes, who normally had high blood pressure, suddenly

11

was recorded as having a blood pressure of 92/58, low in a normal person, but alarmingly so in a woman who was chronically hypertensive.

71.     This abnormal vital sign was not communicated to the doctor and no one followed up with Ms. Cespedes to assess her. There are no nursing or other care notes related to this abnormal blood pressure.

72.     On information and belief, this vital sign was obtained by LPN Jimenez.

73.     LPN Jimenez, even after Ms. Cespedes was known to have low blood pressure, went ahead and gave Ms. Cespedes her medication designed to decrease blood pressure.

74.     For the next two-plus days, CJC medical team members didn't even take Ms. Cespedes's vital signs. Instead, they, including LPN Emanuel and LPN Coyle, continued to give Ms. Cespedes ibuprofen which was making her sicker, and blood pressure medication which continued to depress her already low blood pressure even further.

75.     After October 13th, the next vital signs even attempted on this obviously and emergently sick woman didn't happen until the evening of October 16th.

76.     On October 14th, Ms. Cespedes complained to family of pain on severe pain on her left side.

77.     Given the extent of her deterioration by the time of her hospitalization on the 16th, and the extent of her organ damage, Ms. Cespedes was obviously very sick and in need of transport to the hospital for higher level evaluation on October 14th and October 15th. But as before, she was not sent out for such evaluation.

78.     During this period of obvious illness and lack of food intake, staff do not even appear to have been regularly checking her blood sugar levels, in total disregard for the high

likelihood of serious illness related to lack of food intake alone.

79.     Ms. Cespedes was housed in the medical area throughout her incarceration and so her deterioration would have been readily apparent to medical workers in the area. She was actually seen by LPNs Tabatha Coyle and Nicole Emanuel during that time period for medication administration, yet neither of these medical workers did anything to address her obvious medical crisis.

80.     During the 9:45 to 2:45 shift, deputies noted that Ms. Cespedes "screamed for some of shift."  No one tried to find out why she was screaming or evaluated her for many more hours.

81.     On October 16th, LPN Coyle again saw Ms. Cespedes during medication administration around 3:30 p.m. and saw that she was in medical distress.

82.     Video footage of Ms. Cespedes captures much of her last hour at the jail and shows her in obvious distress and discomfort, hitting and grabbing at her wheelchair.

83.     After med pass, LPN Coyle looks in Ms. Cespedes room but doesn't go in and instead goes back to her desk.

84.     About twenty minutes later a deputy looks into her cell and then leaves and returns with LPN Coyle.

85.     LPN Coyle, two hours after noting the condition on med pass, finally assessed Ms. Cespedes and charted that she had:

> increased confusion, Unable to speak clearly, she said she could not see anything, Pupils sluggish and dilated, Unable to hold herself up, Skin cold to touch, pale in color, Unable to get a BP Manual or Automatic. Femoral Pulse weak, unable to detect any other pulses at time of assessment. Multiple BP checks attempted with Multiple sizes and placement. Unable to get a reading. Pt noted with a panicked expression on her face. Unable to get a O2 reading.

86.     LPN Coyle had expressly recorded that she had observed this at approximately

3:30 pm during "med pass" but, she did not assess her at that time, instead waiting until after completing her med pass rounds, entering information into a computer, and otherwise attending to non-emergent matters.

87.     It was reckless to see an inmate in this condition and delay evaluation of her.

88.     While Ms. Coyle was evaluating Ms. Cespedes, she had her sit up in the bed and then left to get a blood pressure cuff. Ms. Cespedes collapsed and fell straight backwards, slamming her head into the cement wall.

89.     LPN Coyle notes that she tried to take Ms. Cespedes's vital signs and simply but charted that she was "unable to get a set of vital signs."

90.     On two more occasions, time stamped a half hour apart, medical staff recorded that they tried to obtain vitals but could not.

91.     Unobtainable vital signs are an emergency indicating a medical crisis and require an emergent response. Rather than responding to her obviously dire need of medical attention to the hospital, Ms. Coyle waited to try again, bringing in RN Baker twenty minutes later.

92.     At around 5:30 pm, LPN Coyle called RN Baker to come see Ms. Cespedes because she was "not looking or acting normal."

93.     RN Baker noted that Ms. Cespedes was "very pale faced, very wide eyes with pupils 6 mm, wide open mouth, and appeared to be in the classic impending doom fear look."

94.     Ms. Cespedes could not sit up very well and kept falling over.

95.     He also attempted to get a blood pressure but was unable to do so. Ms. Cespedes was confused, and her pupils were sluggish.  She had "short grunting breaths" and "cool, pulseless extremities x 4 w/o [without] measurable Sp02 nor pulse at any time for CJC staff and equipment."

Her fasting blood sugar was 171.

96.     RN Amanda Hutchinson also came in and was unable to find vital signs.  She noted:

> This RN was called to cell 7 in medical to assist other nursing staff.  Upon arrival, pt appeared to be confused and pale. VS were not assessable. This RN called Dr. Maul. Per Dr. Maul, send to ED for R/O PE.  While waiting for AMR to arrive, this RN got an O2 tank and a non-rebreather mask and placed this pt on 10L. Other nursing staff continued to attempt to assess ZVS. CSF and AMR arrived together and immediately began to assess the pt. EKG did not show any signs of MI or abnormalities.  Per CSFD paramedic, pt SpO2 was 89% on 10L."

97.     No ambulance was called for Ms. Cespedes, who was close to death, until two hours after she was first noticed to be in critical condition and days after she started declining. Even after staff finally started looking in on her it took a half hour for staff to call the doctor.

98.     When EMTs arrived to take Ms. Cespedes to the hospital, the medical staff charged with caring for Ms. Cespedes could not even provide EMTs with a medical history and could only give them a medication list.

99.     LPN Coyle, RN Baker and RN Hutchinson told EMTs that Ms. Cespedes had "agonal breathing" and that they had been unable to get a blood pressure reading. EMTs noted that Ms. Cespedes had significant abdominal pain and was able to indicate them that it hurt her to have them evaluate her abdomen.

100.    By the time Ms. Cespedes was sent to the hospital, she was lethargic, confused, disoriented, sickly appearing, and clearly toxic, all of which would have been obvious, even to a layperson, for days before at the jail. During this time, she was already in the midst of a preventable multiple organ failure and her body was going into shock.

101.    At the hospital, she was found to have altered mental status, acute kidney injury, acute lactic metabolic acidosis, respiratory distress, renal failure, and severe lack of oxygen

causing brain damage. All of this extensive damage to her organs would not have happened with timely reaction to her medical crisis.

102.   The Individual Defendants did not even tell the hospital that Ms. Cespedes was on metformin, an important piece of information in her treatment, further delaying her access to needed medical care for her severely deteriorated condition.  Ms. Cespedes sustained irreversible organ damage, including brain damage from lack of oxygen, and was pronounced dead two days later on October 18, 2018.

103.   Individual Defendants abandoned Ms. Cespedes while she was suffering from an obvious medical crisis, recklessly choosing and deciding with deliberate indifference to wait and see if she would get better on her own causing her to die of her treatable medical condition.

104.   Health care workers, including LPN Coyle and LPN Emanuel, in the final days of Ms. Cespedes life did not monitor her vitals, did not communicate her serious change in condition, did not obtain higher level evaluation and recklessly arrogated to themselves medical decision making that was illegally outside of their scope of practice.

105.   Her collapse was utterly predictable given the medications she was administered and her persistent vomiting and lack of appetite. Even once the predictable collapse began, however, staff including Individual Defendants, did nothing but acknowledge the symptoms of her decline, refusing to provide her with obviously necessarily emergency treatment until she was near death.

106.   Susan Cespedes was only 55 years old when she died, causing her Estate and her heirs damages and losses. Her short stay in jail was turned into a death sentence through the deliberate indifference, negligence, and willful and wanton conduct of Individual Defendants and

Armor.

<strong>Allegations Relating to <em>Monell</em> Liability</strong>

107.    At all times relevant hereto, the County contracted with Armor to provide medical personnel and medical care and services to detainees at CJC.

108.    The El Paso County Defendants and Armor maintained constitutionally deficient policies and failed to adequately train and supervise their employees with respect to proper procedures for the evaluation and treatment of CJC detainees' and inmates' serious medical needs.

109.    It was well known by Entity Defendants prior to Ms. Cespedes' death that there was a widespread pattern and practice of deliberately indifferent medical care at the CJC and other Armor facilities.

110.    The County awarded its medical contract to Armor on July 15, 2017 despite knowing Armor was then a defendant in over 100 pending lawsuits alleging the company provided inadequate medical care to inmates, and that Armor had just been banned from bidding on any contracts in the state of New York following a spate of preventable deaths in an Armor facility.

111.    In the six years preceding the El Paso County contract award, Armor had settled at least 35 separate cases wherein detainees and inmates alleged, *inter alia*, delays in medical care; inappropriate medication management, medical, and dental care; medical malpractice; and deliberate indifference to serious medical needs.

112.    Each of the Individual Defendants violated Ms. Cespedes' Fourteenth Amendment right to be free from deliberate indifference to her medical needs in essentially the same unconstitutional manner – failing to adequately treat her significant medical problems, ignoring life-threatening symptoms, and failing to refer her for higher level evaluation and treatment despite

knowing that failing to do so put her at significant risk of serious illness or death. This pattern, standing alone, evinces the Entity Defendants' custom, policy, or practice of deliberate indifference. *See, e.g.*, *Davies v. Israel*, 342 F. Supp. 3d 1308 (S.D. Fla. 2018) (In another deliberate indifference case involving Armor the court, in denying motions to dismiss, noted: "Plaintiff alleges that each Defendant played a different role in tending to Plaintiff when he was unconscious and bleeding but nonetheless disregarded that serious risk by failing to facilitate Plaintiff's immediate emergency transfer to a hospital by, for example, calling 911. In this way, Defendants each participated in delaying necessary treatment for no apparent medical reason, which may constitute deliberate indifference.").

113.    The Entity Defendants' custom, policy, or practice of deliberate indifference and their lack of adequate training, supervision, and discipline regarding assessing and treating the serious medical needs of those in custody at CJC is further evidenced by the following incidents.

114.    On September 7, 2017, Eliezer Tirado-Ortiz was physically restrained by at least six CJC officers while experiencing a drug-related medical crisis. The officers forced Mr. Tirado-Ortiz onto his stomach, piled on top of him, and delivered several hand and knee strikes to his body. After ten minutes, Mr. Tirado-Ortiz appeared unconscious. The responsible Armor nurse failed to immediately begin resuscitation attempts after Mr. Tirado-Ortiz became obviously unresponsive. Eventually, CJC staff attempted to revive him, but Mr. Tirado-Ortiz was already dead. The El Paso County Coroner's Office ruled his death a homicide.

115.    In an October 2, 2017 Notice of Concern to Armor, the County detailed Mr. Tirado-Ortiz's death and pointed out additional incidents of concern in 2017 wherein the intake nurse "did not take charge of the situation." The County charged that the Armor nurse "had trouble setting up

the oxygen tank, and in addition, she had difficulties performing CPR. It was also observed that other medical staff . . . were standing around while deputies were performing CPR."

116.    The notice also raised concerns about an Armor nurse's response to a cardiopulmonary arrest. "During this event . . . [the nurse] was observed walking around trying to find out what was happening but not giving directions. When the inmate was brought to Medical there was a delay on placing a C-collar on his neck and there was a delay in calling AMR for transport to Memorial Hospital." The County concluded that Armor's medical staff's performance "was below required standards."

117.    Despite being put on notice of their substandard performance, not ten days later, on October 11, 2017, CJC inmate Madelyn Taylor Hemphill was forced to give birth into an isolation cell toilet after her calls for medical attention went ignored. Ms. Hemphill's baby inhaled toilet water and stopped breathing. After the baby was resuscitated, she developed an e-coli infection and was in the hospital for three months. Just a day before the birth, EPSO officials met with Armor representatives to discuss a backlog of requests that had left more than 300 inmates without access to prompt medical care.

118.    By December 15, 2017, the National Commission on Correctional Health Care (NCCHC) placed the CJC on probation. The CJC and Armor had failed seven of 39 "essential standards" including: initial health assessments, oral care, nonemergency health care requests and services, emergency services, continuity and coordination of care during incarceration, suicide prevention and health records.

119.    The CJC and Armor also failed to meet three "important standards" including: clinical performance enhancement, which considers the appropriateness of services delivered by

patient care clinicians, orientation for health staff, and nursing assessment protocols, which are guidelines nurses use to perform numerous duties, including administration of prescription medications.

120.    In February 2018, Don Woodson's leg had to be partially amputated when a dog bite he suffered during his arrest festered with gangrene while he was in custody at CJC. Armor and the jail staff's deliberate indifference to his serious medical needs included failure to timely treat his leg.

121.    In mid-2018, about a year into the new contract, the County again notified Armor of deficiencies in their care of an inmate with "large open wounds." The County had determined that the patient needed to be taken to an area hospital, and that Armor staff had failed to refer him for transport.

122.    In August 2018, CJC and Armor staff repeated what they had done to Mr. Tirado-Ortiz less than a year earlier. Deramus Lemuel arrived at CJC obviously intoxicated and substantially impaired from methamphetamine poisoning. He was handcuffed and unable to walk independently. Nonetheless, multiple CJC officers put Mr. Lemuel on his stomach and piled on top of him in an attempt to force him into a safety smock. This struggle lasted more than ten minutes and at approximately 4:07am Mr. Lemuel was no longer visibly moving. An Armor nurse entered the cell and checked Mr. Lemuel's restraints rather than investigate why he had stopped moving. More time passed before jail staff noticed Mr. Lemuel was unresponsive and not breathing. Despite knowing Mr. Lemuel had stopped breathing and detecting only a very weak pulse, the Armor nurse failed to promptly provide him with any medical assistance or call an ambulance. Mr. Lemuel lay unconscious on the ground for at least three minutes before jail staff

finally started performing chest compressions (CPR). Mr. Lemuel never regained consciousness and died two weeks later.

123.     Following Ms. Cespedes' untimely death, Armor's custom, policy, and practice of providing delayed, insufficient, and deliberately indifferent medical care to the people in its charge at CJC continued.

124.     Like Ms. Cespedes, Terry West died from a treatable condition when his cries for help went unanswered and objective indicia of an emergent medical crisis were disregarded. Mr. West had developed a gastric ulcer – a condition routinely treated with over the counter medicine. Two days prior to his death Mr. West complained to an Armor nurse that he was having chest pains. The nurse disregarded Mr. West's serious medical complaint and told him he just needed to stretch. The next day an inmate attempted to report to Armor staff that he saw black stool in the toilet while aiding Mr. West in the restroom, but Armor staff instructed the inmate to leave, so he told a CJC deputy instead. In the hours leading up to his death Mr. West screamed for help to an Armor nurse in the area performing med pass. A CJC deputy reported to medical staff that Mr. West had vomited blood. The Armor nurse just walked away. Mr. West died on June 27, 2019, at 57-years-old, because a gastric ulcer went untreated, eroded the wall of his stomach, and hemorrhaged.

125.     Also, in 2019, Joseph Lee Martinez rapidly decompensated and reported having delusional thoughts when he went more than three weeks without getting his prescription medications at the CJC. In ordering a competency evaluation, Judge Robin Chittum commented, "this has been a common problem," and ordered Armor to produce records showing Mr. Martinez received his medications "at the right time, every time."

126.    Just months earlier Judge Chittum had ordered Armor to do the same for another patient in their care at CJC, James Edward Papol. Mr. Papol went without his prescribed medications for schizophrenia and bipolar disorder for days, and on at least one occasion for more than a week. Mr. Papol's mental state had declined so severely from Armor's inconsistent administration of his antipsychotic medications that he had to be taken to the state hospital.

127.    Too late for Ms. Cespedes and other victims of Armor's constitutionally deficient care, Defendant El Paso County notified Armor on April 3, 2019, that Armor had failed to satisfy myriad contract requirements, "warranting an immediate and strong action by Armor to cure multiple deficiencies."

128.    Specific deficiencies cited in the notice included, among others, "alarming" staffing deficiencies that put "the welfare of Armor's incarcerated patients . . . in jeopardy." EPSO reviewed thirty weekdays in 2019 and found that on average six Armor staff members were absent each day, and that "as many as 11 staff members have been absent on some dates."

129.    As detailed below, it was well known at the time El Paso County hired Armor that the for-profit medical provider has a custom, practice, and policy of understaffing its medical units, and that such staffing shortages often result in constitutionally inadequate medical care for inmates in Armor facilities.

130.    The April 3rd notice emphasized that "Armor's failure to meet contract standards governing provision of general medical services, mental health services, and pharmacy services" and its "actions/inactions . . . unnecessarily subject the County's inmates to significant physical and psychological danger and subject the County & Armor to substantial civil liability due to the non-delegable obligation to provide medical care for its inmates."

131.    The County further charged that Armor's policies and customs have delayed critical care for inmates during emergencies, led to a series of Hepatitis A infections, and left at least one inmate without prescribed medications for ten days.

132.    In June 2019, Armor informed the County it was terminating the CJC contract due to irreversible damage of the parties' relationship, and that Armor would stop providing medical services at CJC at the end of the year. Sheriff Elder, facing mounting claims of substandard medical care, agreed with Armor's decision, saying he had already decided to end the deal with Armor before receiving the letter: "If they want to send the letter and draw the line that says that they're not going to renew the contract, that's their story. . . .  Suffice it to say, (the contract) would not have been renewed either way."

133.    It was also well known at the time the County hired Armor that the for-profit medical provider has a custom, practice, and policy of disregarding and minimizing inmates' medical complaints, depriving their patients of prescription medications, and failing to order diagnostic testing and timely send patients to the hospital in order to save money.

134.    In contracts all over the country Armor agrees to cover all costs, up to a limit, for detainees who require diagnostic testing or outside medical services, including hospitalization and specialized treatment for serious illnesses and medical emergencies.

135.    It appears from Armor's proposal for the CJC contract that Armor's customary financial arrangement was also in place at the CJC:

**El Paso County, Colorado**
**Inmate Medical Services**
RFP No.: 17-003
February 13, 2017

Armor acknowledges its responsibility to pay for hospital care and to track private pay resources for reimbursement to County, as well as screening invoices and providing utilization management services.

136.    Accordingly, Armor had a strong financial incentive not to send seriously ill patients to an outside health care provider.

137.    Indeed, former Armor employees have testified that Armor has a pattern of delaying sending inmates to the hospital and outside specialists in order to increase profits, and that allegation has found backing in several audits of Armor.

138.    Carolyn Rubin, a Registered Nurse who was fired from her job with Armor following the death of Karen Ibarra, an Armor patient at the Sarasota County Jail, testified in her deposition that "there was a strong corporate push for the doctor not to send patients out due to money. . . . It was our duty to keep them there as long as possible, to prevent costs of the hospital, plus pulling deputies out of the jail that have to go sit with the patient at the hospital." *See* Rubin Deposition Transcript at 128, *Ibarra v. Armor Correctional Health Services, Inc., et al*., No. 14-cv-00084-EAK-MAP (M.D. Fla. 2014), ECF. No. 36.

139.    Because Defendant Armor is a national company with a shameful record of providing constitutionally inadequate medical care at carceral institutions across the county, there are a plethora of examples from other facilities demonstrating Armor's culture, custom, policy, and practice of deliberate indifference to the serious medical needs of their prisoner-patients. For example:

140.    In September 2010 Raymond Delgado was confined as a pretrial detainee at St.

John's County Jail, an Armor facility. In mid-September he reported to Armor medical staff that his father had died of colon cancer and that he had observed blood in his stool. He received no treatment for nearly two months, and on November 4, 2010 notified Armor staff in writing that his symptoms were worsening. His stools were thinning, he was experiencing abdominal tenderness, and had lost 45 pounds in a matter of months. When the Armor doctor saw Mr. Delgado later that month, he confirmed that there was blood in Mr. Delgado's stool, noted that Mr. Delgado was experiencing abdominal discomfort, and prescribed Metamucil – an over the counter fiber supplement. Over the next nine months, Mr. Delgado's symptoms persisted and worsened. No colon examination, CT scan, or other routine evaluation for colon cancer was conducted while Mr. Delgado was in the Jail even though Armor staff were aware Mr. Delgado had significant weight loss, blood in his stool, abdominal pain, a family history of colon cancer, and was a male over fifty. When Mr. Delgado was transferred to the Department of Corrections (and out of Armor's care), he was finally rushed to the hospital for emergency surgery. The doctors at the hospital discovered colon cancer had perforated his colon and spread to his liver. Due to the long delay in proper examination, diagnosis and treatment, Mr. Delgado's projected five-year survival rate dropped from 74% to as low as 8%. A lawsuit alleging Armor medical staff were deliberately indifferent to Mr. Delgado's serious medical needs was settled shortly before trial.

141.    On November 24, 2010 Austin Clary was booked into the Brevard County Jail, an Armor facility. Mr. Clary and his family members informed various jail personnel that Mr. Clary suffered from Hypokalemic Periodic Paralysis, a serious medical condition that, if untreated, can cause progressive paralysis, leading to heart failure and death. When Mr. Clary woke up partially paralyzed and repeatedly begged for medical treatment on November 25, jail personnel accused

him of faking and Armor staff refused to administer Mr. Clary's prescription medication. Mr. Clary's paralysis progressively worsened over the day and by the time he was released that afternoon, Mr. Clary was completely paralyzed. Due to Armor employees' deliberate indifference to Mr. Clary's serious medical needs, Mr. Clary's potassium levels had dropped to near-fatal levels by the time he was transported by ambulance to a hospital. He was treated in the intensive care unit for two days before he recovered. A lawsuit regarding the incident was settled in 2014.

142.    On the morning of May 11, 2012, concerned drivers called 911 when they saw Allen Hicks, Sr. swerving his car into a guardrail. He was speaking incoherently and unable to move his left arm when arrested for failing to exit his vehicle. Just after noon, he was booked into the Orient Road Jail, an Armor facility. Rather than perform a medical intake screening, Armor medical staff stood by as jail deputies placed Mr. Hicks in a cell where he was observed lying facedown on the floor and attempting to crawl using only the right side of his body. It wasn't until the night of May 12 that Mr. Hicks was finally taken to the hospital, soaked in his own urine, and diagnosed with an ischemic stroke. Mr. Hicks, a beloved baseball coach and father, slipped into a coma and died within three months. In February 2013, Armor paid $800,000 to Mr. Hicks' estate to settle claims arising from the incident.

143.    On August 7, 2012 Karen Ibarra was booked into Sarasota County Jail, an Armor facility. Within days Ms. Ibarra informed jail staff she was having health problems including difficulty walking. Jail staff accused Ms. Ibarra of faking and dragged her by the arms down a hallway. Ms. Ibarra was not eating or taking her medications and was transferred to the Armor medical unit on August 18th. There, she continued not to eat or take medications for four days. Armor did not send Ms. Ibarra to the hospital even though she had not eaten for days. On the

morning of August 22nd, Ms. Ibarra was found unresponsive in her cell with foam coming from her mouth. She had suffered a brain hemorrhage and was pronounced dead later that morning. A lawsuit regarding the incident was settled in 2015.

144.    In July 2012 Raleigh Priester, an inmate with schizophrenia died in Broward County Jail, an Armor facility, at just 52-years-old. Mr. Priester's schizophrenia went unmedicated despite the fact that the jail psychiatrist thought Mr. Priester's psychosis could have been medically controlled. Armor doctors did not take steps to get Mr. Priester mental health treatment or request a guardian to make medical decisions. Rather, Armor employees rotely accepted this incompetent patient's declinations of care, observed him banging his head on the ground, and watched him starve to death. Mr. Priester also did not get insulin injections, despite having been previously diagnosed with diabetes, because the Armor doctor did not believe Mr. Priester had diabetes. Priester collapsed in his cell and died on July 10, 2012. He had lost 30 pounds in his final six weeks, weighing in at only 120 pounds when he died. Armor settled a lawsuit alleging their deliberate indifference to Mr. Priester's serious mental health and medical needs, and failure to provide him medication caused his death in 2015.

145.    Not six months later, in December 2012, William Herring died from starvation in the very same Broward County Jail. The 23-year-old suffered from bipolar disorder and schizophrenia. He informed jail staff that God would tell him when to eat and was kept alone in a cell where he refused to take his mental health medicine, eat, or drink. Mr. Herring's mother contacted jail staff, told them she was concerned her child was not eating, and pleaded with them to help her son. Over the four weeks he was detained at the jail, Armor staff repeatedly logged Mr. Herring's refusal to take medication, drink and eat. Despite his declining health, Armor

personnel's treatment orders reflected little urgency: Continue to monitor. Offer food and fluid. Continue suicide watch. Mr. Herring lost nearly 20 pounds over two weeks. The day before he collapsed and fell into a coma, an Armor nurse noted that Mr. Herring had a "dazed stare" and a tear in the corner of his right eye. Armor settled a lawsuit based on the incident in 2018.

146.    On December 29, 2012, Tommie Lee Jones died at 51 years old of untreated heart failure and emphysema just two weeks after Armor took over medical care at the Niagara County Jail. Other inmates overheard Mr. Jones begging jail and Armor medical staff to take him to the hospital. They observed that Mr. Jones' condition had visibly worsened and watched jail staff "act as if they did not see the dying man." A 2014 report by the New York Commission of Corrections found that Mr. Jones' death was due to "grossly inadequate medical and mental health care," and recommended that the county consider severing its relationship with Armor. In July 2014, Armor paid $100,000 to Mr. Jones' daughter to settle claims arising from her father's death.

147.    Also, in 2012, a class action lawsuit was filed against Armor on behalf of prisoners at the Fluvanna Correctional Center for Women. The plaintiffs sought "declaratory and injunctive relief to address and remedy the failure of FCCW, on a systemic, pervasive and on-going basis, to provide its residents with medical care sufficient either in nature or in extent to satisfy the minimum standards mandated by the Eighth Amendment to the United States Constitution." The case record reflected Armor employees routinely denied prisoners medications, refused requests to see a doctor, and missed appointments for chronic care. In February 2016, plaintiffs, Fluvanna officials, and Armor finalized a settlement that installed a compliance monitor and other terms designed to ensure Armor would provide the bare minimum level of care.

148.    On July 14, 2014, John Gleeson, a 40-year-old electrician and father of two died in

Nassau County Jail, an Armor facility. Mr. Gleeson had a history of hereditary angioedema, a condition where swelling bouts can escalate into breathing emergencies. Mr. Gleeson had repeatedly requested access to the medication he took at home. On the day he died Mr. Gleeson made several trips to the medical unit, where he received Benadryl before being sent back to his cell and locked down for the night. The inmates in Mr. Gleeson's housing unit say that his throat had swelled dramatically, and that Mr. Gleeson had reported serious breathing difficulties in the hours before he died. In its September 15, 2015 Final Report for John Gleeson, the New York State Commission of Correction concluded that Armor's delivery of healthcare "was incompetent and deficient," and that Mr. Gleeson's death may have been prevented if he had been "provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment." The Commission directed the Nassau County Legislature to conduct an inquiry into Armor's fitness as a correctional medical care provider, paying specific attention to "Armor's pattern of failing to properly manage patients [sic] chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." Armor settled a lawsuit based on the incident in January 2020.

149.    On May 1, 2015, 28-year-old April Brogan was found dead in a cell at Volusia County Branch Jail, an Armor facility. When she was booked into the facility three days prior, she exhibited clearly observable symptoms of opiate withdrawal. She continued to decline during her detainment, and various other inmates called Armor, requesting help for Ms. Brogan. Ms. Brogan was vomiting and became extremely dehydrated, but Armor declined to administer intravenous fluids. Armor staff's deliberate indifference to Ms. Brogan's obviously serious medical needs

included failing to provide necessary opiate withdrawal treatment during the three days she was in their care. A lawsuit arising from Ms. Brogan's death was brought against Armor, its employees, and other defendants in 2017.

150.    In 2016, John Kinlaw, a detainee at Lunenburg Correctional Center, an Armor facility, fell in the recreation yard and fractured his hand. Despite x-rays showing that Mr. Kinlaw needed significant medical attention, the Armor doctor treated Mr. Kinlaw with just an ice pack and Motrin. Mr. Kinlaw repeatedly informed Armor medical personnel over the next several weeks that he needed further medical attention, but he got none. Mr. Kinlaw was not taken to an orthopedic specialist for 100 days, and when he was taken, the specialist concluded Mr. Kinlaw's hand had healed wrong and could only be fixed by surgery, if at all. Mr. Kinlaw filed suit against Armor, and in July 2019 a jury awarded Mr. Kinlaw over $1 million in compensatory and punitive damages.

151.    On April 1, 2016, Scott Burrell, an inmate at North Broward Bureau jail, and father of two, died a slow and painful death from a common and easily treatable abdominal infection. Two days before his death an Armor LPN examined Mr. Burrell and documented that Mr. Burrell was complaining of severe abdominal pain and had critical vital signs consisting of a weak pulse and a blood oxygen saturation that had decreased to 88%. She also recorded that Mr. Burrell was incontinent of urine, his jail uniform was soaked with urine, he was disheveled, dirty and his gait was so unsteady that he was placed into a wheelchair to be moved to the infirmary. Despite knowing that Mr. Burrell was medically critical, the LPN did not have Mr. Burrell transferred to an outside hospital for care and treatment.

152.    Mr. Burrell was examined less than an hour later by an Armor Physician Assistant,

who recorded Mr. Burrell was wheelchair bound, disheveled, odiferous, unsteady, short of breath, wearing a blood and urine stained uniform, with a rapid heart rate and an elevated temperature. She also failed to have Mr. Burrell sent to an outside hospital for care and treatment, or to make any arrangements to diagnose the cause of Mr. Burrell's critical vital signs and abdominal pain.

153.    Three hours later Armor employees found Mr. Burrell in his cell covered with fresh feces, urine, and vomit and curled in a fetal position. Per the medical records Mr. Burrell's blood pressure had fallen to a critically low level, and his pulse was extremely rapid. Mr. Burrell again stated that his abdomen was painful and winced in pain when he was bathed.

154.    Despite his medically critical condition, Mr. Burrell was not sent to a hospital, but was just moved to the infirmary. Over the next day and a half Mr. Burrell's vital signs remained critical and his mental state was clearly altered. Armor staff made no attempts to diagnose the cause of Mr. Burrell's abdominal pain or move him to a hospital – they simply continued to monitor him. Mr. Burrell was vomiting and exhibiting signs of severe infection and dehydration. He was examined several times by various Armor employees, none of whom took any steps to get Mr. Burrell to the hospital.

155.    At 10:45 a.m. on April 1, 2016, Mr. Burrell was found unresponsive in his cell and was transported to North Broward Medical Center, where he was pronounced dead. The medical examiner concluded that Burrell died from "peritonitis secondary to bowel perforation." Armor settled a lawsuit related to Mr. Burrell's death in May 2018.

156.    On August 24, 2016 Kristina Fiebrink was brought into the Milwaukee County Justice Facility obviously suffering from alcohol and opiate withdrawal symptoms. Despite her readily observable acute medical condition, Ms. Fiebrink was placed in a general population unit

without medical monitoring or access to medical care. She did not receive an intake screening, and by the night of August 27th Ms. Fiebrink's symptoms had worsened drastically. Through that night and into the morning she was experiencing hallucinations, vomiting, and profuse diarrhea. Despite these obvious acute symptoms, and Ms. Fiebrink's cries for help, which could be heard throughout her general population unit, jail staff provided Ms. Fiebrink no medical care. On the morning of August 28, 2016, Ms. Fiebrink tragically died on the floor of her cell without ever having been seen by Armor medical staff. Armor settled a lawsuit related to Ms. Fiebrink's death in January 2020.

157.    In August 2016 Charles Jones died in Brevard County Jail, an Armor facility. For weeks preceding his death, Mr. Jones had been complaining of severe stomach pain. Days before his bowel burst, Mr. Jones developed numerous symptoms of enterocolitis and/or bowel obstruction, including sharp pains, fatigue, constipation and anemia. Two days before he died, an Armor LPN documented that Mr. Jones' "breath had a fecal odor to it," which is a sign of a bowel blockage. Days later, when he was finally taken to a hospital, Mr. Jones was in septic shock. Armor staff had delayed getting Mr. Jones to the hospital for too long and he died. A lawsuit based on Mr. Jones' death was filed in 2018.

158.    On October 28, 2016, Michael Madden died at the Milwaukee County Jail, an Armor facility. On the day he was detained and in the days that followed, Mr. Madden repeatedly told Armor medical staff that he had a congenital heart defect, that he was an intravenous drug user, and that he had used intravenous drugs the day he was detained. Medical staff knew that Mr. Madden's history put him at high risk for developing an infection in his heart, and over the course of his detention, Mr. Madden had obvious signs of infective endocarditis—a serious, but treatable,

heart infection and medical emergency. In the days preceding his death, after having completed withdrawal protocol, Armor medical staff documented Mr. Madden was experiencing an abnormally high heart rate, extremely low blood pressure, was pale, and was so weak he could hardly walk. He had a fever and chest pains, and submitted written requests to be seen by medical staff. When Mr. Madden began hyperventilating on the morning of October 28th, Armor nursing staff asked Mr. Madden to try to slow his breathing and to relax rather than calling for an ambulance. Mr. Madden was forced to attempt to walk to the medical unit and was by then so weak he fell several times, smashing his head on concrete twice. When Mr. Madden was finally transported by wheelchair to the clinic he was not breathing and was ultimately pronounced dead. A lawsuit related to the incident was filed in 2018.

159.    In 2016 Terrill Thomas, a 38-year-old father of six died of dehydration in Milwaukee County Jail, an Armor facility. Armor medical staff were aware that Mr. Thomas had a history of bipolar disorder, including a known prescription for psychotropic medication. They were also aware that Mr. Thomas was diabetic and had hypertension. Armor failed to provide Mr. Thomas medication, blood sugar tests, blood pressure measurements, or any mental health care the entire time he was in their care.

160.    Mr. Thomas predictably decompensated due to being unmedicated and flooded his cell while obviously suffering a mental health crisis. Jail staff moved Mr. Thomas to the disciplinary unit and ordered his bedding removed and water turned off until his behavior improved. There, despite being seen numerous times by Armor medical staff, Mr. Thomas spent the last week of his life locked in an isolation cell 24 hours a day, with no drinking water, no edible food, no working toilet, no mattress, no blanket, no shower access, no means of cleaning his cell,

no ability to communicate with his family, no relief from constant lockdown, and no meaningful access to urgently needed medical or mental health care. He languished and suffered in this filthy, unsanitary cell with nothing but his jail uniform and rations of nutraloaf, which, without water, were inedible. Other inmates reported to jail staff that Mr. Thomas desperately needed water and medical care, but none came. Mr. Thomas was found dead in his cell eight days after being booked into the facility. He had lost 34 pounds.

161.     Armor was criminally charged with seven counts of intentionally falsifying Mr. Thomas' health care records in February 2018. The complaint alleged Armor employees "engaged in a pattern and practice of intentionally falsifying entries in inmate patient health care records." The district court denied Armor's motion to dismiss the criminal charges, concluding that evidence in the criminal complaints established probable cause, in part, because, "[t]he employees served a corporate goal of minimizing staffing cost at the workplace."

162.     Milwaukee County and Armor later paid Mr. Thomas' estate $6.75 million to settle a civil lawsuit arising from his death.

163.     In 2016, following the successive deaths of several inmates in Nassau County Jail, an Armor facility, the New York State Commission of Correction issued a series of scathing reports, concluding Armor was "incapable of providing competent medical care." In the report concerning the death of William Satchell, the Commission concluded the death of the father of four "was preventable if not for the shocking level of inadequate medical care and negligence of the [Armor's] medical staff." The Commission further emphasized that Armor repeatedly failed to recognize "life-threatening manifestations" of "a new onset medical condition" or diabetes. Armor also made a "definite medication error," giving Mr. Satchell an antipsychotic known to increase

blood sugar levels and possibly sparking the onset of his "unstable condition," the Commission found. It further concluded Armor "grossly mismanaged" Mr. Satchell's high blood pressure and delayed seeking emergency hospital care for "a critically unstable" patient, which was "contributory to his death."

164.    In 2016 the New York Attorney General filed suit against Armor, alleging a "failure to provide access to medications" as one of several ways Armor failed to meet contractual obligations and placed inmates at risk. In five separate cases since 2011, state investigators found that inmates died due to inadequate medical care provided by Armor. Armor agreed to pay $350,000 and not bid on any contracts in the state for three years in a 2016 settlement with the New York Attorney General.

165.    El Paso County Defendants have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees and are therefore liable for the unconstitutional actions of Armor and its employees toward Ms. Cespedes.

166.    Armor's failure to deliver needed medical care to Ms. Cespedes was motivated by constitutionally impermissible profit-driven reasons. The company had a widespread policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on its contract. It was foreseeable that the insufficient budgeting and spending would cause harm to detainees in need of medical care, and such conduct caused or substantially contributed to Ms. Cespedes' unnecessary pain, suffering, and death.

167.    Armor also had a widespread pattern, practice, and custom of failing to properly monitor inmates with serious medical needs, particularly those with chronic conditions such as diabetes and hypertension.

168.     Armor failed to adequately train its personnel to recognize and respond to the serious medical needs of detainees. Armor also failed to train its nursing staff on how to conduct proper medical examinations, including the need to conduct blood sugar tests where indicated. The need for this training was obvious, and it was foreseeable that such training deficiencies would cause harm to detainees.

169.     Alarming deficiencies in screening, staffing, monitoring, and the delivery of medical and mental health care were also identified in previous notices and were otherwise known and obvious to Armor for years prior to Ms. Cespedes' death. Despite this knowledge, Armor and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk.

170.     The corporate policies, practices, and customs described above were a moving force behind Ms. Cespedes' suffering and death and the constitutional violations alleged in this complaint.

171.     Armor may also have ratified the unconstitutional conduct of its employees and agents with respect to the mistreatment and death of Ms. Cespedes, if Armor tacitly condoned these deficient actions by failing to adequately investigate what happened and failing to discipline the responsible healthcare providers.

### V.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment**
**Unconstitutional Medical Care**
(Plaintiff Estate against each Individual Defendant)

172.     Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

173.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

174.    Susan Cespedes was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

175.    Ms. Cespedes was a pre-trial detainee.

176.    As a pre-trial detainee, she was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment.

177.    Under the Fourteenth Amendment, Ms. Cespedes is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

178.    To the extent she was under any conviction, she would also have been from deliberate indifference to her known serious medical needs by the Eighth Amendment.

179.    There is no qualified immunity for private actors working in a jail.

180.    Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

181.    As a result of the allegations contained in this Complaint, Individual Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Cespedes' rights under the Fourteenth by acting with deliberate indifference to her serious medical needs and disregarding the excessive

risks associated with his serious and life-threatening medical condition, despite being expressly aware of her known serious medical needs and obvious need for the same.

182.    As a result of the allegations contained in this Complaint, Individual Defendants are liable under 42 U.S.C. § 1983 for the violation of Ms. Cespedes' rights under the Fourteenth by engaging in conduct that was objectively unreasonable and not rationally related to a legitimate nonpunitive governmental purpose.

183.    All of the Individual Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

184.    The acts or omissions of these Defendants were the legal and proximate cause of Ms. Cespedes' injuries and her Estate's losses.

185.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

186.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

187.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment**
**Unconstitutional Policies**
(Plaintiff Estate against Entity Defendants)

188.    Plaintiff Estate hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

189.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

190.    Susan Cespedes was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

191.    Ms. Cespedes was a pre-trial detainee.

192.    As a pre-trial detainee, she was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment.

193.    Under the Fourteenth Amendment, Ms. Cespedes is also protected from conduct that is not rationally related to a legitimate nonpunitive governmental purpose or actions that appear excessive in relation to that purpose under *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).

194.    To the extent she was under any conviction, she would also have been from deliberate indifference to her known serious medical needs by the Eighth Amendment.

195.    As a result of the allegations contained in this Complaint, Defendant Armor is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies. [1]

---

[1] Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to

196.    The El Paso County Defendants are non delegably liable for the constitutional violations of Armor.

197.    Policies include written policies as well as customs, habits, training, and practices. The unconstitutional policies of Defendants to this claim resulted in the violation of Ms. Cespedes' Fourteenth Amendment right to adequate medical care and to humane conditions of confinement.

198.    Defendant Armor knew that the aforementioned policies, practices, and customs posed a substantial risk of serious harm to inmates like Ms. Cespedes, and it was obvious that such harm would occur.  Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference of the individual health care workers towards Ms. Cespedes' medical needs and the policies, practices, and customs described herein. All acts or omissions committed by Defendants were the direct and proximate result of the Estate's damages.

199.    In the light of the duties assigned to individual health care workers and deputies, the need for more or different training and supervision of them was obvious, and the failure to do so by Armor was deliberately indifferent to the rights of the relevant public and a moving force in the injuries to Ms. Cespedes and her Estate.

200.    Armor's policies, practices, habits, customs, widespread usages, and lack of training and supervision that resulted in the failure to provide proper medical care to treat Ms.

---

prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

Cespedes' known serious medical needs were not rationally related to a legitimate nonpunitive governmental purpose.

201.    Defendant Armor ratified the unconstitutional conduct of their employees, agents, and/or subcontractors with regard to the unconstitutional conduct visited upon Ms. Cespedes, as they approved of the conduct and the basis for it.

202.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the individual defendants.

203.    The acts or omissions of these Defendants were the legal and proximate cause of Ms. Cespedes' injuries and her Estate's losses.

204.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, suffering, pain, and and other special damages, all in amounts to be proven at trial.

205.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

206.    Plaintiff is also entitled to punitive damages against Armor, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

### THIRD CLAIM FOR RELIEF
**Wrongful Death**
(Plaintiff Jonathan Cespedes against Armor and Individual Medical Defendants)

207.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

208.   Armor is a private corporation that contracts with El Paso County to provide medical care and health services to inmates at the CJC.

209.   Armor is vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to, Individual Medical Defendants.

210.   Individual Medical Defendants are private individuals, not governmental actors, and are therefore not entitled to any immunity under the CGIA.

211.   At all times relevant to this action, Ms. Cespedes was under the medical responsibility, care, and treatment of Defendants hereto.

212.   Individual Medical Defendants and other private medical care workers had a duty to provide care to inmates at the CJC, including Ms. Cespedes.

213.   Individual Medical Defendants had a doctor-patient, nurse-patient or EMT-patient relationship with Ms. Cespedes and were acting within the scope of their employment.

214.   With respect to their care and treatment of Ms. Cespedes, Individual Medical Defendants owed her a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Through their actions and omissions, Individual Medical Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Ms. Cespedes.

215.   These duties of care are informed by state law. Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

216.     Armor also had a duty to implement reasonable policies and exercise reasonable care in the training of medical workers at the El Paso County jail. Armor breached its duty to exercise reasonable care in the training of medical workers in a manner that provided the inmates under their care with reasonable medical care and treatment.

217.     As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff and Ms. Cespedes other heirs at law have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

218.     Plaintiff and Ms. Cespedes other heirs at law suffered and continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward their mother, including, but not limited to, economic and non-economic damages for grief, loss of his mother's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional distress. Plaintiff hereto is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

219.     Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Ms. Cespedes and the Plaintiffs.

220.     Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court award against Defendants:

(a)     All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages available under the law;

(b)     Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all individual defendants and corporate defendants;

(c)     Punitive damages on state law claims upon suitable amendment after completion of substantial discovery;

(d)     Attorneys' fees and costs;

(e)     Pre- and post-judgment interest as appropriate; and

(f)     Any further relief at law or equity that this Court deems just and proper.

**PLAINTIFFS RESPECTFULLY REQUEST TRIAL BY JURY.**

Respectfully submitted this 7th day of May, 2020

*/s/ Anna Holland Edwards*
Anna Holland Edwards
Erica T. Grossman
John Holland
Dan Weiss
Rachel Kennedy
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
anna@hheglaw.com
Phone:  (303) 860-1331
Fax:  (303) 832-6506
*Attorneys for Plaintiffs*

## **CERTIFICATE OF REVIEW**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

*/s/ Anna Holland Edwards*
Anna Holland Edwards